Get out. Here first for Mr. Matthew Keita. Thank you, Your Honors. Good morning. May it please the Court. As this Court is aware, this case arises out of a very tragic incident in which five peace officers opened fire and killed a mentally handicapped man while he was riding his bicycle in front of his house. The District Court ultimately dismissed all claims against all parties, the officers as well as Kaufman County. We're here to ask this Court to reverse that decision and remand for trial. And I think this case presents two very important issues for this Court's civil rights jurisprudence that should be addressed. The first is, is a lawsuit against a municipality or a government agency sufficient to place the individual employees within that agency or within that municipality on notice of potential claims against them? And that's an issue that hasn't been squarely addressed by three or four cases that have come out of this Court over the past 20 years. The other is, what is really the proper role for expert testimony in a Section 1983 case when the ultimate issue being decided is, was the actions of the officers reasonable or unreasonable? And that's the central in the case. What can an expert provide for us? I'd like to ask the Court if we can address those in reverse order, because obviously if this Court concludes that the actions of all of the officers on the scene were reasonable, it doesn't need to address the other issue. But obviously, I'll take any direction from the Court as it would like. I think first looking at the reasonableness issue, let's start with the first principle, which this Court has held since its 1994 opinion in Mangieri v. Clifton, which is that qualified immunity is not appropriate for disposition on summary judgment when there are divergent views of what happened in the first place. And I think to quote this Court's opinion, it basically says that courts are simply unable to make a determination of the reasonableness of an officer's activities without settling on what happened or a coherent view of what happened in the first place. There's also the first principle of the standard of review on summary judgment, which is that the facts are taken in a light most favorable to the non-movement and that all doubts or credibility are resolved in the non-movement's favor. So what we have here and the reason we ask this Court to reverse the district court's decision is that the district court ultimately based its conclusions on what happened based on the affidavit testimony of the officers. The district court repeatedly states throughout its opinion that it believes that Gabriel, the young man who was killed in this case, had a gun in his hand while he was riding his bicycle, that he had his hands in the air and was waving the gun around while he was riding his bicycle, and that he repeatedly disregarded orders from the officers to put down his weapon. And as a result of this fear that was instilled because of these things, all of which the district court presumed to be true, they concluded that the officers were Now, the fact is, is that it's undisputed that some of these officers were between 100 and 500 yards away at the time that this incident occurred. And the district court further concluded that even though they were far away, it was reasonable for them to rely on the representations of their other officers on the scene that these statements were, in fact, correct. Well, the underlying premise here is that somebody had to be right, okay? Somebody had to express these things. He has a gun, he has his hands in the air, he's refusing to drop his weapon. If those things aren't true, then not only was it unreasonable for one of the officers to make those representations, it was also unreasonable for other officers to open fire on him. Otherwise, essentially, all any officer would need to do is yell, he's got a gun, and it would be open season on any alleged suspect. Somebody has to be correct in these statements. So what the plaintiffs, the appellants in this case, attempted to do was to rebut the assertion of qualified immunity by hiring an expert. And they hired a forensic videographer who took extensive look at the dash cam video and came to the conclusion that, based on my analysis of this video, at the time of the shooting, not only was the distance correct, several hundred yards away, but from what we could see, his hands were on his handlebars, he was not yelling, he was not screaming, he wasn't waving anything, and that no gun was visible. That, respectfully, is a fact issue. And the district court, simply in a footnote, I think that's on page 639 of the record, footnote 5, simply says, I reviewed the video. I don't believe that this is sufficient. I couldn't make heads or tails of it, therefore, I'm discounting it. But that's not the standard of review. It's undisputed, and this Court's addressed it several times, saying that expert testimony cannot be used to make a blanket ipsy-dixit assertion of this conduct is unreasonable, or, you know, I would have done things differently. That's not allowed, but that's not what's being offered here. The expert in this case is specifically saying what happened is not the way they say that it happened, and because the Court's underlying premise was that these statements are correct. Let me ask you this. Yes. You said you hired a forensic videographer. Yes. This is a person who looks at a video. Yes. What else does he do that a layperson couldn't do by looking at a video? My understanding, and I believe he sets out his qualifications in his CV, Your Honor, is he is able to analyze video that's not simply turning on the television and pressing play, but can, you know, enhance the pixels, you know, look in further detail. So the need for a forensic videographer would suggest that a layperson can't just look at the video and say, this is what it shows. Correct, Your Honor. Typically, when I'm looking at a video, I see what they intended I see. What it shows, exactly. Right? And a police dash cam, for example, is not necessarily intended to record something from several hundred yards away. Right. It's to get something right in front. Unfortunately, that's all the evidence that we have. We have the testimony of the shooters. Gabriel Windsor is dead, and we have these videos. You got his dad's statement, don't you? No, we do, and that's another issue that came up, and I believe that it also creates a fact issue. The appellees have suggested that the sham affidavit doctrine applies because his statements have been marginally inconsistent with respect to— Well, I don't want to stop you from explaining how a forensic videographer helps me to see what I didn't see. So, go ahead. In essence, Your Honor, he was able to focus in on parts of the bicycle, the video where Gabriel was on the bicycle, and where the sound that was being recorded by the dash cam, and what was being said at the time it was being said, and what could reasonably be seen or inferred from those vantage points. And didn't the video show arm movement at approximately the same time that the officers opened fire? I believe James Appleton said, Your Honor, that there was no arm movement, that his hands were on his handlebars throughout. Did you look at the video? I have looked at the video. It's been months, but at the end of the day— It's grainy, but you can see arm movement. And I believe the—Your Honor? Go ahead. Oh, you don't think you're about to ask something. I'm sorry. I believe he said that there was arm movement, but his hands remained on his handlebars the entire time, I believe was the statement out of his expert report. And if I'm mistaken, I'll look and readdress on rebuttal. But at the end of the day, we believe that the court, the district court anyway, by simply dismissing this and saying that it wasn't sufficient to create a fact issue, ignores the standard of review. You're not relying on the father's affidavit? We will also say that the father's affidavit— Looked to me like the father's affidavit was not inconsistent with his initial story or pleading. I agree with that as well, Your Honor. I think that the—although there was a dispute as to whether he had anything on him at all at one point in time— And he says he didn't take his hands off the handlebars. Exactly. He didn't have the toy pistol in his hands that the police shot him for no reason. That's essentially what the father says, yes. And the Eppolese had argued that because the original— Well, that certainly creates a disputed fact— I agree. —as to what happened. I agree. Saying to me, why don't you rely on that instead of your video, may not be very compelling either way. I don't— I think there's two reasons that I address the expert assertion first. It's because in these cases, oftentimes, we believe expert testimony is necessary. And we have a published opinion out of the district court in which it simply disregards these conclusions of an expert in a footnote. And I think it's important for this Court to remind all district courts throughout the circuit that expert testimony is useful in these cases and that it's necessary in some circumstances. Certainly, we believe there's a fact issue that can be raised by the father's own assertions that his son had his hands on the handlebars or wasn't using a gun. But to simply just suggest that expert testimony that you don't like can just be written off of, well, you know, I looked at the video myself and I disagree with it, I think that that's dangerous precedent and that's not consistent with the standard of review. Let me ask you a question. Did the lawyer who drafted the affidavit a year after the initial complaint, was he the same lawyer who drafted the Third Amendment complaint, the First Amendment motion for leave, the motion for leave to file the Fourth Amendment complaint? Was he the same one? It's my understanding that's correct, Your Honor. Okay. Because in all of those pleadings, there's a specific reference to identifying the gun, the gun being a plastic toy, looked like a real gun. They described the color of the gun in great detail. Every time he was walking in the neighborhood with a bright orange gun. Then the affidavit says, oh, there was no gun in view. So it's completely inconsistent as far as I'm concerned with the initial statement the father gave and then with all these follow-up attempts to amend the pleading before they finally come with the affidavit that says, miraculously, he had no gun in his hand, his hands were on. So I can understand why the judge didn't believe it and considered it a sham affidavit. How do you evaluate all these tremendous descriptive differences? I would, if I'm remembering the most recent affidavit correctly, and again, I'll verify it and make sure I don't make a misrepresentation, the father was affirming in his statement that he did not have a gun, a pistol, a firearm. Not that his hands were empty or he had nothing whatsoever. Again, if I'm wrong, I'll double-check. I know that there were many statements where he didn't have a real gun, but he did have a gun. He did not have a real gun. That's not the way the affidavit reads. Okay. Allow me to look back, Your Honor, and I'll answer your question in rebuttal if that's acceptable. Sure. Allow me, just assuming... Yeah, look, you've got to clarify this for us, because as I read the father's statement and the pleadings, he never said he had the gun, the pistol or whatever it was, in his hand. Correct. He said he had it on him, and he was going to show it to the police. Correct. But he didn't say he had it in his hand in the complaint. And in the affidavit, he clearly, specifically said he did not have it in his hand. Again, let me... When he was shot. Let me address the inconsistency when I come back on rebuttal, because I want to double-check. Okay. Assuming, for sake of argument, that there is enough to create a fact issue here, I think the next question that the Court has to address... Tell me what fact issue you're talking about. Identify specifically the fact issue you're talking about. Whether Gabriel had a gun in his hand. While Gabriel was riding his bike down the street, did he have a gun in his hand? Was he waving the gun in the air? All right. So in that connection, because you're taking me way away from what I thought this was about. I thought his father had said he didn't have a gun in his hand. Didn't. All right. But then you're telling me, in response to a question from Judge Clement a few There's one affidavit where I believe he says that he did not have a gun. And there are other affidavits where he talks about having a toy. David was in possession of an orange toy gun. And, again, that's what I just want to... But there was never an instance, as I understand it, and I do want to be correct, because this is an important fact issue to me. Yeah. His father never said he had a gun in his hand. Did he ever say that? I do not believe he did, Your Honor. I'm certain. All right. That's important to me to know. Yes. All right. Assuming that that fact issue is created, that there was not a dispute, a genuine issue of material fact and dispute as to whether he had a gun in his hand at the time and was allegedly ignoring officers' requests to put it down. The next question is, who is a proper defendant in this case? How can you have the third amendment complaint say he was walking in the neighborhood with a toy gun. It's clearly apparent that the gun Gabriel had in his hand was not real based on the color of it. And then there are two other allegations about the color and that he had the toy gun. You can't have it both ways. I think we might be in violent agreement here, Judge. Okay. I think that we're ostensibly saying that there's no reasonable belief that any officer could have assumed that Gabriel was waving a live pistol or something that looked like a pistol in the air and refusing. These officers just got shot at, correct? Excuse me, Your Honor? These officers were just shot at. There were other officers that were, yes. There were allegations that someone was firing in the neighborhood. The question, though, is whether Gabriel was, excuse me, whether the officers were reasonable in opening fire on Gabriel at this particular instance. Right. And the district court ultimately concluded that they were because it believed the officer's testimony that he was waving a gun in the air and refusing to put it down. And therefore, the officer's conduct in firing on him was reasonable. So what do you contend the officer saw at the time they began firing on Winsor? We honestly don't know, Your Honor. I mean, the vantage point, I believe they state in their own affidavits, was between 90 and 500 yards away. That's a football field. Let me ask you it a different way. What do you contend he was doing at the time he was fired on? Riding his bicycle down the street. With waving a gun in the air or with his hands on the handlebars? With his hands. What do you contend he was doing? Riding a bicycle down the street with a toy in his pocket and with his hands on his handlebars. And that's what we believe the video establishes, Your Honor. I see that I'm out of time. Allow me to double-check to answer Judge Clement's question, and I'll let you address the following issues on revolt. Thank you, Your Honor. Thank you, sir. Mr. Hawkins. Good morning. May it please the Court. I'm Robert Hawkins, and I'm here with my colleague Stephen Cass Weiland. We represent Coffman County and the three individual law enforcement officers that were named as defendants in this lawsuit. I know the Court is well acquainted with the issues, especially, I think, the events leading up to the shooting of Gabriel Windsor on April 27, 2013. I will go ahead and take the issues as appellant's counsel wanted to I think it's important to stress here in regard to Judge Godbee's decision on qualified immunity, and Judge Clement, you started to hit on that. One thing the plaintiffs ignore, they're talking about whether Gabriel Windsor had a gun, toy gun, real gun, what color. At the time, he was shot. But what happened up to that point? What happened up to that point? Because Judge Godbee concluded that these officers reasonably believed that Gabriel Windsor posed a serious risk of harm. That's the test. That's the test for excessive force. And that's why he found there was no constitutional violation in this case. So what happened up to that point? I'm sure the Court is aware. You've seen transcripts of 911 calls from numerous residents out there in the neighborhood telling the police dispatcher, we have a guy, we don't know who this guy is. We don't know who he is. He is firing a weapon. He's shooting at us, shooting at mailbox, threatening people. He says, I'm going to take what's mine. Everybody's going to get what's theirs. And those same transcripts in the record, those kinds of calls from frantic neighbors out there are being radioed to the police officers. Hines, Officer Hines, Trooper Hinojosa are the first ones to show up. And they encounter the suspect in the roadway. He turns and fires a weapon at them. They don't dispute that. They don't dispute that there was a weapon fired at Hines and Hinojosa. They both say in their statements, we heard a bullet go by us. And from there, other officers converge on the scene. They're getting radio traffic from the dispatcher, watching the suspect, trying to find out where he is. He disappears from time to time, goes off the roadway. At one point, dispatchers tell the officer. In fact, Mr. Hines said he saw some smoke, didn't he? Yes, sir. He saw a puff of white smoke, he said. That seems strange to me, but the supposed shooter was 150 yards away, and he sees smoke when he hears the bullet go by. Right. Well, he said about 100 yards away when they first encountered the suspect. He saw the smoke right at him. I'm sorry? The smoke was right near him, as I understood it. I think what he said in his statement, he saw a smoke or some sort of discharge from the weapon as it was being fired. I didn't see that. I believe that's what he said. I can certainly check on that, Your Honor. But there's no question that both officers who first responded to this scene believe that someone shot at them with a weapon. So when they finally, the team is together, converging on where they think the last known whereabouts of the suspect is, he comes out on a bicycle, and the officers in their statements all clearly say, he had something, we saw something. Some call it a handgun, the shape of a handgun, or was reaching for something. That is clear. The question before this Court on this issue is whether those officers reasonably believed at that moment that Gabriel Windsor had a weapon or not. And that's the issue. Ultimately, I think Judge Godbee said, you know, it doesn't matter. And this Court's cases are very clear. Whether a suspect in an excessive force case, whether a suspect is ultimately armed with a toy gun, real gun, no gun, it doesn't matter because the key is what the officers, from their perspective and the circumstances which they were confronted with, did they have a reasonable belief that this guy posed a risk of danger? They're seeing a guy on a bicycle. One of the officers says, that's the suspect who just shot at us, or something to that effect. I believe that is in Officer Huddleston's statement. They identified the suspect. Then you've seen video. Didn't one of the officers say, put your hand down, put your arm down, or something like that? That's exactly right. I apologize, Clement. And this is all on video. And this Court has routinely said video evidence is very compelling. Video evidence is very compelling, especially in the summary judgment context. But one officer says he's got that gun. And then another officer says put the gun down before all the officers open fire.  No, sir. The Supreme Court has said in one case that we may look at the video as controverting what the defendant, criminal, the guy that was being chased. What he says, if the video is overwhelming, that that story was incorrect. That's correct. That's an entirely different kind of case. That's correct. I mean, it's not always dispositive, but it is critical. And we can't ignore the father's eyewitness. The father was an eyewitness to this, as I understand. And he said he was watching this young man, and he did not have the toy pistol in his hand. And he was riding out with his hands on the handlebars to show it to the police. When he was shot. So to me, that's a conflict in fact, a disputed issue of fact, that has to go to trial. In other words, after a trial, your take on the situation may be correct. But we can't ignore this contrary eyewitness testimony, can we? Well, I think what key there, Your Honor, is, and I don't know that Mr. Windsor, the father, Henry Windsor, was an eyewitness to this. I think he says he was in the backyard or in the house at the time this was going on. And on the video, you can see Gabriel Windsor come out the roadway on his bicycle, and he is riding his bicycle for at least several feet before the officers open fire at him. So I'm not sure Henry Windsor was an eyewitness to actually what happened. He does suggest in his affidavit that his son was not, well, I think he called it unarmed. I think he admits that he had a toy gun. In fact, you haven't heard and you won't hear Mr. Windsor dispute that when they had the altercation in the backyard of his residence, he tossed a toy gun when the officers asked, where's that gun? He tossed the toy gun. That is not disputed in this case. So I think the record is very clear. Gabriel Windsor at least had a toy gun, hence Judge Godbee, in trying to construe the evidence in the plaintiff's favor said, okay, it's a toy gun. It's a bright orange toy gun. Well, I think it's undisputed he had a toy gun. It's also undisputed there was no real gun anywhere around. I disagree respectfully. I disagree respectfully with that, Your Honor. There is evidence in the record that, well, we do have evidence, clear evidence, that there was a real gun involved at one time. I mean, we have 911 callers reporting this guy is walking the neighborhood shooting. But you didn't come up with it. The police didn't come up with it, did they? Find one on the scene. There is a reference in the record, and I'll point it to page 331. There was a ballistics report that was done that's in our summary judgment appendix. There is a reference to at least three handguns that were recovered or tested and underwent ballistic testing. We believe those were recovered from the house. There's no dispute that none of the officers shot any handguns. They all had rifles or shotguns. But two of those guns, if you look at that reference to the record, two of those handguns. What killed the victim? One of the officers shot guns. He was shot four times. There's nothing in the record. Was there an autopsy and ballistics report done on that? There's nothing in the record to identify exactly which rifle or which shotgun fired the weapons that hit Mr. Windsor. But, yes, there was an autopsy done. Are you saying there's evidence that there was another gun present that was fired by someone other than an officer? I'm suggesting there's evidence that there was a real handgun fired at one time. There were handguns located later, we believe, at the Windsor residence. Is there evidence that there was a gun fired at that scene that wasn't fired by an officer? At the scene? As the officers first showed up. As the officers first showed up to the scene, to the state trooper and Officer Hines, they both reported being fired at and heard the bullet go by, and you also had the neighbors. So the evidence is the officer's testimony that he heard a bullet go by. That's all the evidence, isn't it? Well, he saw it. It was fired by someone other than an officer. It was fired by someone other than an officer. Yes, I'm saying, but the only evidence of that is an officer saying a bullet whizzed by. That's correct, Judge. I can walk out of here and say a bullet whizzed by. That doesn't mean one did, does it? Well, it's on the video where they pull up. They identify the suspect in the road. There's no bullet on the video. Sir, right. And there's no gun on the video. Well, on the video, the first video, yeah, you cannot see the gun, but both officers report of being shots fired. Both of them report on the radio. I mean, we agree. The only evidence of shots being fired is the testimony of an officer that a bullet whizzed by. That's correct, and it's uncontroverted, Your Honor. It's uncontroverted. 911 calls. The 911 calls. These neighbors are reporting there's a man with a handgun. He is shooting the handgun. He is firing it. He's threatening us. The record is replete with evidence that there was a real handgun, and that real handgun was fired. Now, take that to the moment that Gabriel Windsor comes riding out on his bicycle, and these officers had just been shot at. Two of the officers had just been shot at. They had gotten all these reports from residents in the county, reporting this guy out in the neighborhood, yelling these things and shooting people. And that is where, Judge, God. I'm sorry, shooting at. There were reports that he was firing his gun. He was shooting at mailboxes. I didn't mean to suggest he was shooting. Did they look at the cap gun? Sir? Did they look at the cap gun? Was it a cap gun he had? It was some sort of toy gun. I don't know if it was a cap gun itself. It was a toy gun, and, of course, there's evidence in the record that Henry Windsor tossed that handgun to the officers when they had the altercation in the backyard. But there's clearly evidence, we would submit, Your Honors, that these officers, confronting what they did on that day and just having been fired upon, two of them, could reasonably believe that Gabriel Windsor was the same guy who just fired at them. In fact, one of the officers says that is the same guy, and he was later identified by Trooper Hinojosa in the backyard as Gabriel Windsor was laying on the ground. Hinojosa's statement says that's the guy who shot at us. The nearest officer to Windsor at the time the shots were fired was how close? I'm sorry? How close? The officer nearest to Windsor at the time the first shots were fired was how far away from Windsor? The shots from the officers. Right. Approximately 90 to 100 yards, I think, is their all of them. That's the length of a football field. That's correct. All right. That's correct. And notwithstanding the length of that, we have, again, the question is what were these officers confronted with? And that is very clear. It's very clear from the record, and we think that we would submit the district court properly considered that, properly considered all of the evidence, in fact, bent over backwards to view the evidence in the plaintiff's favor and concluded that deadly force, the officer's use of deadly force, was reasonable. Let me get to the first issue that appellant's counsel mentioned, and that was this notion that, and this is the statute of limitations question. I believe counsel described it as a significant issue of imputing notice to officers for purposes of the relation back principle in Rule 15C, imputing notice to officers by suing the government entity itself. I don't believe they cite any case that supports that proposition, that naming, for example, Coffman County would give notice to all of its deputies that they were intended to be sued in this lawsuit. In fact, we cited a case in our briefing, Moore v. Long, which essentially refutes that. I think that case involved a lawsuit against the Dallas County district clerk. The plaintiff later tried to join a deputy clerk after the statute of limitations had run. This Court said, no, we're not going to impute notice to a deputy clerk just based on a lawsuit filed against the Dallas County district clerk. It's clear, well, regardless of this identity of interest theory that the plaintiffs want to rely on, this Court in the Jacobson v. Osborne case specifically said, even if it does apply, there still has to be a case of mistaken identity. And that's where Judge Godbee focused on in his opinion. There was no evidence, and this is the plaintiff's burden, to prove that they're entitled to relation back. There was no evidence that any of these officers, the four at issue, knew or should have known that they were to be original defendants, but for a mistake concerning that identity. I'm sure the Court has seen the complaints, the one filed by the mother and sister of Gabriel Windsor. It only named the three government entities, Coffman County, the City of Terrell, and the City of Coffman. And Henry Windsor's separate pro se complaint did name two individuals and then the John Doe defendants. Of course, Judge Godbee said, John Doe, when you name John Doe defendants, that is not a case of mistaken identity for purposes of the relation back principle under Rule 15. And that's what this Court said in the Jacobson v. Osborne case. I think the plaintiffs also argued at the time that they didn't know they could sue individuals. And again, Judge Godbee said, that's not a mistake. That's not the kind of situation, the classic situation, a misnomer where you sue the wrong defendant and then later realize you left out the right defendant or you sue the right defendant but use an incorrect name. Those are the classic cases where relation back comes into play. This is not one of those cases. And I think they argued in their briefs that they couldn't discover the identity of these officers. Well, that's nonsense. Officer Wheeler actually testified in the criminal trial of Henry Windsor after the shooting. There were certainly ways for the plaintiffs to discover the identity of these officers. But they waited, as the Court is aware, they waited until the eve of the expiration of the statute of limitations to file this lawsuit. And by doing so, decided to join John Doe defendants and then added them after the statute of limitations. But Judge Godbee was correct in concluding that that is not a situation involving relation back. And we would ask the Court to affirm that ruling as well. One final issue, if I could address, is the Kauffman County's summary judgment motion. Very quickly, it was based on the simple notion, which this Court has often recognized, that there must be a constitutional violation to impose liability on the government. And that has been recognized in many cases in the last several years. That was the reason that Judge Godbee granted the County's motion for summary judgment. So, unless there are any other questions, I see my time is almost up. But we would respectfully ask the Court to affirm the District Court's order dismissing the case against these officers in Kauffman County. Thank you, sir. Mr. Dia, you have five minutes on the ball. Thank you, Your Honors. I'd like to begin by addressing the inconsistency that Judge Clement raised in my opening argument. I think if you look at the allegations that are read in Henry Windsor's first pro se complaint, page 794 of the record, in that one he simply says that day he was playing with a plastic toy cap gun. In the Fourth Amendment complaint, which is, or the motion for leave to file it, which was supported by an affidavit, on page 497 he starts by saying he was playing with a bright orange toy gun, and it later notes the gun that he had in his hand, dot, dot, dot. However, on the very next page, on page 498, and again in the Fourth Amendment complaint, page 581, it specifically states, Gabriel did not have a gun in his hands while he was on the bike. Gabriel had both hands on the handlebar of the bike as he rode towards the street. On page 514 of the record is Mr. Appleton's affidavit, who reviewed the video. He concluded, both appear to be on the handlebars. There is no sight of a gunshot near the bicycle. That affidavit was a year after the shooting, correct? Excuse me, Your Honor? The affidavit, which Judge Godbee considered sham, was a year after the shooting. Is that correct? Well, Your Honor, the pro se complaint was filed two years after the shooting and What was the year after the complaint, the initial complaint? Approximately. A year after something. If I have the dates correctly, the original complaint was filed on April 22nd, 2015, and they attempted to add two additional defendants on February 22nd, and that was the plea, so it was 10 months afterwards was the additional. But regardless, we maintain that it's been our position throughout, both from the eyewitness testimony of Henry Windsor and from our expert testimony, that there is a legitimate factual dispute as to whether he had a gun in his hands and whether he was waving his hands at the time the shooting occurred. I'd like to, if I may, use some of my time on rebuttal to address, ironically, rebutting what they addressed our issue on the— Also tell us about what the record says about real guns. Excuse me, Your Honor? Real guns, what the record says about real guns. I don't recall the record saying anything with respect to Gabriel Windsor having a real gun. I know that there is some evidence that real guns were recovered from the property, but I don't recall any testimony at all suggesting that Gabriel Windsor ever had a real gun whatsoever. Okay, well, I was hoping to learn something about it. You don't have any more information than what Mr. Hawkins said. That's correct, Your Honor. And at least it wouldn't be relevant for purposes of the summary judgment motion. How do we know from reading the record that those guns that were recovered from the property later were not one of the weapons that was fired in this? I don't think the Court needs to address that issue, Your Honor, because this is their motion for summary judgment in which they said, here is our evidence showing that it was reasonable. They weren't saying the evidence recovered from the property on a later date may have been used, or after the incident may have been used in the altercation. They were saying Gabriel was waving his hands on the bike. Whether or not it's a fact that the officers had been fired on, is that a fact that's irrelevant to our determination now about what the officers were faced with in the moment? Is the fact that they alleged that somebody had fired on them, is that fact irrelevant? I don't think it's irrelevant. I think it's something the Court can take into consideration. But I think more to the point, it's something the jury takes into consideration when they determine reasonableness. I mean, at the end of the day, the fact that they were fired on earlier, you know, is – It has some relevance whether or not the officer was fired on. I guess it factors into the larger – the story in general. But, I mean, this Court has been clear that the – I guess where I'm going is maybe I want too much. If you're telling me guns were recovered from the Windsor property, then I can't imagine it would be too much to expect that somebody would do some ballistics testing, see whether or not that gun had been fired, look for shell casing. Gunshot residue on his hands, et cetera. Yes. And so I guess either none of that was done or nobody but me thinks it may be important, and so perhaps it isn't. Or certainly not the basis of the motion. All right. Was the – did the autopsy show gun residue? I believe there was – allow me to address it in a 28-day brief, Judge. I haven't addressed the autopsy here. It's like you would know that. Excuse me? It's like you would know that. I focused primarily on the basis of the defendants that the Iapolis used for claiming qualified immunity. They weren't claiming that Gabriel shot them. They were claiming that they believed Gabriel posed a danger to them. Right. Which would certainly be relevant. Excuse me? Certainly be relevant to a determination of reasonableness, which is what Judge Godbee was evaluating. But at the end of the day, the question is not might he – let's pretend for the sake of argument. May I go over my time really briefly? I see I have – It's still green. It shows me I have four seconds left. Okay. Talk fast. Okay. Assume without conceding that Gabriel Windsor had fired a gun earlier that day, okay, and that there was gunshot residue on his hands or on his property, that there were guns on the premises. At the end of the day, the only question that this Court has to answer or the district court had to answer was, was it permissible, was it reasonable for these officers to open fire on this boy at the time that they did? I know. I was just curious. Okay. Thank you. Would the Court like me to address the other issues or can I rest on my brief? No, you're out of time. Thank you, Your Honor. Thank you, sir.